**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JERRY CLINTON ASHWORTH,**

     **Plaintiff,**

**vs.**                                                                    **CIVIL ACTION NO. 3:16-CV-10556**

**NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered November 7, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 15 and 16.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 15.), **DENY** Defendant's request to affirm the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

decision of the Commissioner (Document No. 16.); **REVERSE** the final decision of the Commissioner and **REMAND** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Jerry Clinton Ashworth (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on December 12, 2013, and his application for Title XVI benefits on December 17, 2010, alleging disability beginning August 31, 2008 due to "learning disabilities and anxiety".[2] (Tr. at 217.) His claims were initially denied on April 11, 2011 (Tr. at 114-118, 119-123.) and again upon reconsideration on June 10, 2011. (Tr. at 129-131, 132-134.) Thereafter, Claimant filed a written request for hearing on July 11, 2011. (Tr. at 135-136.) An administrative hearing was held on September 9, 2012 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 83-109.) On October 15, 2012, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 62-82.) On November 5, 2012, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 39-61.) The ALJ's decision became the final decision of the Commissioner on January 7, 2014 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6.)

On February 26, 2014, Claimant sought judicial review of the decision (Tr. at 583-585.), and the Commissioner moved for voluntary remand, which was granted by this Court on July 30, 2014. (Tr. at 586.) On October 31, 2014, the Appeals Council remanded the matter to the ALJ. (Tr. at 587-592.) Another hearing was held before ALJ Meade on October 27, 2015. (Tr. at 518-555.) On January 22, 2016, the ALJ again entered a decision finding Claimant was not disabled.

---

[2] Claimant also alleged that he stopped working on August 31, 2008 because "I was fired and I was on unemployment for 2 years." (Tr. at 217.)

(Tr. at 488-517.) On February 18, 2016, Claimant requested additional time to file his exceptions to the unfavorable decision (Tr. at 484-487.) and subsequently filed same on March 24, 2016. (Tr. at 660-670.) The Appeals Council considered the reasons Claimant disagreed with the ALJ's decision (Tr. at 480-481.) and on September 16, 2016 declined to assume jurisdiction of the case, rendering the unfavorable decision the final decision of the Commissioner. (Tr. at 474-479.)

On November 4, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 15.), in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 16.), to which Claimant later filed his Reply. (Document No. 17.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 44 years old when the ALJ determined he was not disabled; he is defined as a "younger person" by the Regulations on the date last insured ("DLI") and throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 509.) Claimant did not graduate high school, he left in the eleventh grade and had behavioral problems in school. (Tr. at 535, 542.) Claimant has difficulty reading and never held a job where he had to write or read (Tr. at 524.); he used to work for his father flagging traffic, but had to quit because of "road rage" and he could not get along with coworkers. (Tr. at 524-525.) Claimant lives alone in West Virginia, and his father lives in Ohio, however, his father helps Claimant pay his bills, clean his house, and stays with Claimant once or twice a month. (Tr. at 535-536, 537, 540.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical

shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None,

one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through March 31, 2012. (Tr. at 493, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since August 31, 2008, the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found for **Title II** purposes, that Claimant suffered from the following severe impairments as of March 31, 2012: post-concussion syndrome secondary to an ATV accident; borderline intellectual functioning; reading disorder; major depressive disorder; and generalized anxiety disorder. (Id., Finding No. 3.) The ALJ next found for **Title XVI** purposes, Claimant suffered from the following severe impairments: post-concussion syndrome secondary to an ATV accident; borderline intellectual functioning; reading disorder; major depressive disorder; generalized anxiety disorder; degenerative disc disease of the lumbar spine; and osteoarthritis. (Tr. at 498, Finding No. 4.) At the third inquiry, the ALJ concluded that for purposes of both Title II and Title XVI, Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 499, Finding No. 5.) The ALJ then found that for Title II purposes, from August 31, 2008 to March 31, 2012, Claimant had no exertional limitations, but

limited to simple, routine, and repetitive tasks. He could only work in a low-stress job (defined as a job that has only occasional decision making required and has only occasional changes in the work setting). He could not interact with the public and could have only occasional interaction with coworkers and supervisors. (Tr. at 501, Finding No. 6.)

For Title XVI purposes, the ALJ found Claimant had the residual functional capacity ("RFC") to perform medium work as defined in the Regulations except

> He must avoid concentrated exposure to vibrations. He is limited to simple, routine, and repetitive tasks. He can only work in a low-stress job (defined as a job that has only occasional decision making required and has only occasional changes in the work setting). He cannot interact with the public and can have only occasional interaction with coworkers and supervisors. (Tr. at 504, Finding No. 7.)

At step four, the ALJ found for purposes of both Titles II and XVI, that Claimant was incapable of performing his past relevant work. (Tr. at 508, Finding No. 8.) At the fifth and final step, the ALJ found that Claimant was 36 years old on the alleged onset date, making him a younger individual; that he had a limited education and able to communicate in English; that the transferability of job skills was immaterial to the determination of disability because his past relevant work is unskilled; and that based on his age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Claimant can perform. (Tr. at 509, Finding Nos. 9-12.) The ALJ determined that Claimant had not been under a disability from August 31, 2008 through the date of the decision. (Tr. at 510, Finding No. 13.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant's appeal is based on three grounds: (1) that the ALJ erred by not finding Claimant's impairment met § 12.05; (2) that the ALJ deviated from Fourth Circuit precedent in considering Claimant's subjective complaints; and (3) that the hypothetical question to the VE was inappropriate resulting in opinion testimony that there were jobs available in significant numbers that Claimant could perform. (Document No. 15 at 2.)

Claimant asserts that he meets Listing 12.05 for intellectual disability because two examiners, Mr. Brian P. Bailey, psychologist, and Dr. Timothy S. Saar, licensed psychologist, both

diagnosed Claimant with mild mental retardation, and both specialists administered IQ testing that resulted in scores meeting 12.05 criteria. (<u>Id</u>. at 9-10.) The ALJ impermissibly rejected the psychologists' diagnoses and supplanted his own lay opinion that Claimant's reduced IQ scores achieved as an adult were the result of substance abuse or head injury. (<u>Id</u>. at 11-12.)

Next, Claimant contends the ALJ deviated from the two-step process espoused in <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996) when he evaluated Claimant's allegations of pain and symptomology by failing to expressly make the threshold finding that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. <u>Bradley v. Barnhart</u>, 463 F.Supp.2d 577, 582 (S.D.W.Va. 2006) (Copenhaver, D.J.). (<u>Id</u>. at 12-14.)

Finally, the ALJ's RFC assessment limiting Claimant to simple, routine, repetitive tasks fails to sufficiently account for his finding Claimant had moderate difficulties in concentration, persistence or pace pursuant to <u>Mascio v. Colvin</u>, 780 F.3d 632, 638 (4th Cir. 2015). (<u>Id</u>. at 14-16.)

In conclusion, because the final decision is not based upon substantial evidence, Claimant asks this case be reversed and remanded only for payment of benefits. (<u>Id</u>. at 16.)

In response, the Commissioner argues that Claimant did not meet the criteria of Listing 12.05, where his living independently and ability to use heavy equipment for work are inconsistent with the Listing's requirements, instead, Claimant entirely focuses on his IQ scores in his argument. (Document No. 16 at 12.) The evidence showed that Claimant's low IQ scores did not establish onset of intellectual disability prior to age 22, and the ALJ had the discretion to weigh the evidence of how Claimant's substance abuse and head trauma impacted subsequent IQ testing. (<u>Id</u>. at 13-14.)

Next, the Commissioner points out that the ALJ found that Claimant met the initial

threshold and then properly assessed Claimant's credibility in accordance with controlling case law and Regulations. (Id. at 14-16.)

Finally, the Commissioner asserts that the ALJ properly accounted for Claimant's moderate difficulties in concentration, persistence or pace with the restrictions to simple, routine and repetitive tasks in a low stress work environment, and further, the ALJ explained why the record did not support any additional or more specific limitations in the RFC assessment. (Id. at 17-18.) In sum, the Commissioner contends the final decision is supported by substantial evidence and asks that it be affirmed. (Id. at 19.)

In reply, Claimant reasserts that the ALJ violated the Commissioner's own Regulations when he relied on Claimant's 1985 IQ test results than the results obtained in 2011 because the 1985 score would only have been valid for two years as Claimant was only 13 years old pursuant to 20 C.F.R. Part 404, Subpt. P, App. 1 § 112.00D(10). (Document No. 17 at 1-2.) Moreover, in 1989, when Claimant was 17, his lowest IQ score was 74, which can support a diagnosis of mild mental retardation or intellectual disability according to the American Psychiatric Association. (Id. at 2.) Finally, Claimant concedes that the ALJ made a threshold finding under Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), although notes that the ALJ's threshold finding is unclear in its application to both Title II and XVI claims. (Id. at 2-3.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Records Related to Intellectual Functioning:

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

In May 1984, when Claimant was 12 years old, he was given the Wide Range Achievement Test (WRAT) that indicated his reading skills measured at a 4.1 grade equivalent; spelling at a 2.6 grade equivalent; and math at a 4.7 grade equivalent (Tr. at 312.) An evaluation for the 1983-84 school year noted that his reading "improved very well," he had "good growth" in spelling, and he could perform "math computation very well". (Id.)

By October 1985, Claimant's academic records included a Woodcock Johnson test that showed he read at a 1.9 grade level when he was in the seventh grade. (Tr. at 294, 305.) He was placed in a program for students with Specific Learning Disabilities. (Tr. at 296.) Claimant was also administered three Wechsler Intelligence tests while in school, with a Performance IQ of 91, Full Scale IQ of 84 in October 1985 at age 13. (Tr. at 305, 328). A WAIS-R was administered in February 1988 when Claimant was 17, yielded a Verbal IQ of 74, a Performance IQ of 87 and a Full Scale IQ of 78. (Tr. at 278.)

On March 21, 1988, a behavior rating scale indicated that Claimant very frequently had his work poorly organized; that he criticized, belittled or made derogatory remarks concerning the importance of the subject matter of the course; and that he came to class having lost, forgotten or misplaced his books, pencils or other necessary materials. (Tr. at 290.)

School records from the West Branch School District withdrew Claimant from school due to non-attendance as of February 1, 1990. (Tr. at 273.) While in school, Claimant received special education services, but earned passing grades (mainly Bs, Cs and Ds). (Tr. at 254-256, 439.)

Employment History:

After leaving school, Claimant started working as a laborer. (Tr. at 89.) Between 1988 and 2005, Claimant worked for 24 different employers (Tr. at 204-209.), however, earning records

indicate that he worked consistently between 1990 and 2008. (Tr. at 205-210.) In the first administrative hearing, he testified he would get frustrated on the job and would get fired for getting loud on the job or for getting into fights with other employees. (Tr. at 94, 96.) He then worked for his father's company from 2005 to 2008. (Tr. at 209-210.) Claimant had testified that when he worked as a flagger, people cursed him, spit at him and threw things at him. (Tr. at 90.) He stopped working for his father's companies when the companies closed. (Tr. at 93.)

State Agency Consultants:

On April 7, 2011, Rosemary L. Smith, Psy.D., reviewed the medical evidence and completed a psychiatric review technique and mental RFC assessment. (Tr. at 442-458.) She determined that Claimant's post-concussive syndrome, learning disability, major depressive disorder, and anxiety disorder were "severe" and that Claimant had mild restriction of activities of daily living, mild difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation of extended duration. (Tr. at 442-452.)

Dr. Smith reviewed the listings, including Listing 12.05, and determined that Claimant did not meet or equal a mental listing. (Tr. at 452-453.) Dr. Smith opined that prior testing indicated that he "is **not** mentally retarded." (Tr. at 454, emphasis in original.) Further, despite his mental limitations, Dr. Smith found Claimant was able to understand, remember, and carry out simple instructions, make simple work-related decisions, respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting. (Tr. at 458.) In June 2011, psychologist Dr. Timothy Saar affirmed Dr. Smith's opinion as written. (Tr. at 461.)

On June 9, 2011, Porfirio Pascasio, M.D. reviewed Claimant's medical records and determined that he did not have a severe physical impairment. (Tr. at 428-435, 460.)

<u>Hospital Records Related to Physical Impairments:</u>

On January 3, 2009, Claimant went to the St. Mary's Emergency Room complaining of insomnia, nightmares, vomiting and diarrhea; his brother had committed suicide two weeks before. (Tr. 411, 436). The treatment note also indicates that he was taking klonopin until October. (Tr. at 411).

On June 1, 2009, Claimant returned to the St. Mary's Emergency Department due to injuries he sustained when the four-wheeler he was driving rolled over the top of him, causing facial lacerations and a loss of consciousness; it was noted that he was not wearing a helmet. (Tr. 380-382.) He had a Glasgow coma scale of 15, but was amnestic for the events just after the accident. (Tr. at 381, 385.) At the time of the accident, a urine drug test was positive for benzodiazepines, cannabinoids and opiates. (Tr. at 386.)

Claimant sought treatment for testicular pain in 2010 and 2011, and he was assessed with small epididymal cysts with no further treatment was recommended. (Tr. at 359-360, 464, 471.)

On June 1, 2014, police transported Claimant to the emergency room with complaints of diffuse pain all over after he was involved in an altercation at a party and arrested for resisting arrest; though intoxicated, Claimant was able to answer questions clearly. (Tr. at 736, 739.) On admission, a lumbar x-ray showed moderate degenerative changes at L5-S1, but no acute fracture. (Tr. at 742.) X-rays of his chest and cervical spine were normal. (Tr. at 743-744.) Physicians assessed Claimant with a back contusion and "medically cleared for jail" that same day. (Tr. at 740.)

On July 17, 2014, Claimant saw Buddy Hurt, D.O.[5] as a new patient with complaints of

---

[5] Dr. Hurt also began treating Claimant for mental health issues, discussed *infra*.

pain in his coccyx, shoulders, knees, and left ankle, as well as insomnia, anxiety, and panic attacks. (Tr. at 749.) Claimant reported that his pain was intermittent and did not occur every day. (Id.) His overall physical examination findings were normal except for coccyx point tenderness to palpation. (Tr. at 751.) A depression screening was positive for depression. (Tr. at 752.) Dr. Hurt assessed Claimant with a developmental disorder – reading, and bipolar disorder. (Tr. at 751.) Dr. Hurt prescribed psychotropic medications and instructed Claimant to follow up in four weeks. (Tr. at 752.) During a follow up appointment in August 2014, Claimant stated that his mood swings and depression were improved, but he felt "hung over" from the medication. (Tr. at 746.) Claimant's physical and psychological examinations were normal. (Tr. at 747.) Dr. Hurt encouraged Claimant to seek outside activities and instructed him to follow up in three months. (Tr. at 748.)

Claimant returned to Dr. Hurt in November 2014, due to possible exposure to hepatitis C. (Tr. at 769.) His physical and psychiatric examinations were normal and Dr. Hurt sent Claimant for a blood screening, which was negative. (Tr. at 771, 777.) In May 2015, Claimant saw Dr. Hurt for medication refills. (Tr. at 765.) Claimant reported his medications were helping; his physical and psychiatric examinations were normal. (Tr. at 767.)

Records Pertaining to Mental Impairments:

On December 17, 2010, during a telephone conversation with Social Security claims interviewer K. Staley, Claimant indicated difficulty with understanding, coherency, concentration, talking and answering. (Tr. at 214.) K. Staley observed that, "He sounded very tired, his speech was slurred, he said he could not remember a lot of things because he is in pain constantly". (Id.)

On March 8, 2011, Bradley P. Bailey, M.A. conducted a psychological evaluation at the request of the West Virginia Disability Determination Section. (Tr. at 436-441.) On the Wechsler

Adult Intelligence Scale – IV, Mr. Bailey found that Claimant had a verbal comprehension score of 63, a perceptual reasoning score of 65, working memory score of 60, a processing speed of 59 and a full scale IQ of 56; the results were valid. (Tr. at 439.) On a Wide Range Achievement Test – 4, Claimant read at less than a kindergarten level, perform sentence comprehension at a 2.8 grade level, spell at a K.2 grade level and perform math at a third grade level; the results were valid. (Tr. at 440.)

On mental status examination, Mr. Bailey found that Claimant's insight was poor; his immediate and recent memory were moderately deficient, although his remote memory was mildly deficient; his concentration was severely deficient based on the standard score of two on the Digit Span task; his persistence was moderately deficient; and his pace was mildly deficient. (Id.) Mr. Bailey observed Claimant's social functioning to be functional and responsive, he avoided eye contact, expressed great anxiety regarding the situation, was closed in posture and exhibited no sense of humor or spontaneous speech. (Id.)

Claimant noted that on a typical day "he 'lay around' and watches TV". (Id.) He indicated that he cooks, but usually buys prepared or microwaveable food, drives but he does not have a license, washes his clothing, tends to personal care needs, shops in stores, and cleans his house. (Tr. at 440-441.) Claimant reported a primary work history as a construction laborer, but noted that also worked as a restaurant cook, maintenance person, and dishwasher. (Tr. at 439.) He stated that he is able to use jackhammers, concrete saws, heavy equipment, grills, and commercial dishwashers. (Id.)

Mr. Bailey diagnosed Claimant with major depressive disorder, single episode, severe with psychotic features; generalized anxiety disorder, with panic attacks; and mild mental retardation.

(Tr. at 441.) Mr. Bailey found that the mild mental retardation was substantiated by his full scale IQ of 56, and by his level of adaptive functioning in the areas of self-care, social/interpersonal skills, academic skills and use of community resources; his prognosis was poor. (<u>Id</u>.)

After Mr. Bailey's consultative examination, on April 7, 2011, Disability Examiner Cheryl Tunes, proposed a presumptive approval based on the full scale IQ of 56 and a mild MR diagnosis, she found no discrepancies in the activities of daily living and valid IQ scores. (Tr. at 223.) On April 8, 2011, Ms. Tunes completed a report indicating that Claimant could perform his past relevant work as a flagger. (Tr. at 225.)

On June 28, 2011, Claimant saw Scott D. Williams, M.D., a psychiatrist, for problems with bereavement after the loss of several family members. (Tr. at 473.) Dr. Williams assessed him with "bereavement versus adjustment disorder versus major depression/anxiety" and started him on psychotropic medications and to follow up with Trilium counseling and/or psychiatry. (<u>Id</u>.) The record contains no evidence of follow up counseling or a return to Dr. Williams's for services.

On September 10, 2011, Dr. Timothy Saar evaluated Claimant at his request. (Tr. at 466-470.) Dr. Saar administered a Wechsler Adult Intelligence Scale – IV and a Wide Range Achievement Test, Fourth Edition. (Tr. at 468-469.) Dr. Saar found psychomotor retardation, depression, constricted affect, moderately to markedly impaired memory according to the WAIS-IV and SLUMS (St. Louis Mental Status Examination) results and moderately to markedly impaired attention/concentration on the WAIS-IV. (<u>Id</u>.) Claimant achieved a verbal comprehension score of 66, a perceptual reasoning score of 73, a working memory of 63, processing speed of 81 and a full scale IQ of 65. (Tr. at 469.)

On the Wide Range Achievement Test, Claimant read at a kindergarten level and

performed sentence comprehension at less than a kindergarten level. (Id.) Dr. Saar attributed the nine-point increase in his full scale IQ because he was tested only five months previously by Mr. Bailey: "[T]hus, more than likely, this increase is due to a practice effect, as his Verbal Comprehension and Working Memory were very consistent with the prior testing." (Id.) Dr. Saar diagnosed major depression, single episode, severe; generalized anxiety disorder and mild mental retardation. (Id.)

On July 17, 2014, Claimant began mental health treatment with his primary care physician, Dr. Buddy Hurt. (Tr. at 749-752.) He reported feelings of hopelessness or depression and little interest or pleasure in doing things six to seven days per week. (Tr. at 752.) At his follow-up appointment on August 14, 2014, Dr. Hurt prescribed Paxil 20 mg. and Vistaril 25 mg. every 6 hours for anxiety and Seroquel 100 mg. for depression. (Tr. at 748.) Claimant returned to Dr. Hurt on November 13, 2014 reporting that he was unable to tolerate the side effects of medications, but was unable to report what the side effects were. (Tr. at 769.) His main concern that day was possible exposure to hepatitis C. (Id.) By May 14, 2015, Claimant returned for medication refills and reported he was still having trouble with depression, but felt Seroquel helps and requested Restoril for anxiety. (Tr. at 765.)

On July 2, 2015, Claimant saw Michael Patrick Hackman, M.D., for a mental health intake evaluation, also at Valley Health. (Tr. at 760-764.) He complained of mood swings, anxiety, and panic attacks; his mental status examination showed no disorientation to person, place, time, or date; an adequate fund of knowledge; no impairment of abstract reasoning; normal judgment; normal speech; normal, full-ranging affect; unimpaired thought processes; normal behavior; intact insight; normal thought content; and no evidence of suicidal/homicidal ideation. (Tr. at 760, 762-

763.) Dr. Hackman assessed Claimant with mild intellectual disabilities, mood disorders, NOS, and anxiety disorder, NOS; he adjusted his medications and instructed him to return in two months. (Tr. at 763.) Dr. Hackman also advised Claimant to be free of THC by 2016, otherwise he will no longer receive controlled substances from him. (Id.) A follow up examination on September 8, 2015 indicated no change in Claimant's diagnoses or symptoms (Tr. at 781.), although he reported that the medicine was not working. (Tr. at 780.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he does not get along with people due to his mood swings. (Tr. at 524.) He sees a physician for his mood swings and anxiety. (Tr. at 525.) In addition, Claimant testified that he also sees a doctor for arthritis for which he receives prescription medication. (Tr. at 525-526.) His arthritis causes him pain in his joints, knees, ankles, lower back, and hands. (Tr. at 528.) Claimant's pain and depression cause him to not function like he should. (Tr. at 529.) He tries to clean the house as best he can, but he has a hard time "getting going." (Id.) He also takes medicine to help with his sleep because he sleeps only every other day or two. (Id.) Claimant mostly microwaves his meals and is unable to do yard work at his house due to his depression and he physical does not feel like it. (Tr. at 530.) He has no hobbies, does not drive and bathes maybe three or four times a week. (Tr. at 531.)

In 2009, Claimant had an ATV accident, causing him head trauma; he still gets sharp pains in his head at times. (Tr. at 532-533.) His concentration and memory are poor, and he takes a long time to finish a task, such as washing dishes. (Tr. at 534.) Claimant also had difficulties trying to learn lessons in school. (Id.) He stated he gets frustrated a lot and he sometimes would act out with

the teacher. (Tr. at 535.) He has also been involved in fights with people, although he does not think he says anything to start fights. (Tr. at 536-537.)

Ralph Ashworth Testimony:

Mr. Ashworth is Claimant's father. (Tr. at 539.) Although he lives in Ohio, he also owns a home in West Virginia where Claimant resides and checks on him once or twice a month to make sure he has what he needs. (Tr. at 540.) He sometimes stays in the house with Claimant, but he will stay in a trailer on the property to "get away from [Claimant]." (Id.) He stated that Claimant gets argumentative and he will return to Ohio when he had enough of him. (Id.) Claimant does not drive. (Tr. at 543.)

He employed Claimant previously and had to move him around a lot because he constantly had problems getting along with the other employees. (Tr. at 540-541.) Mr. Ashworth did not think Claimant had any friends, and no other family members visit Claimant. (Tr. at 541.)

Claimant was in special classes in school due to behavior problems (Tr. at 541, 542.); he was a March of Dimes baby and did not talk until he was four years old. (Tr. at 541.) He thought Claimant left school at age 16 or 17, in the ninth or tenth grade. (Id.) Claimant had fistfights with other students at school and fights on the job, too. (Tr. at 542.) Claimant also had trouble at his church, needing police involvement; they tried "to cast the devil out of him." (Tr. at 543.)

Mr. Ashworth testified that Claimant's intellectual functioning had been about the same, he is unable to figure things out. (Tr. at 545.)

Gina Baldwin, Vocational Expert ("VE") Testimony:

During the years Claimant's employment was at substantial gainful activity levels, in 2006 and 2007, the VE testified that his prior work as a construction flagger is light, unskilled work.

(Tr. at 548.) In response to the ALJ's hypothetical of an individual of Claimant's age (40), education and work experience, with no exertional restrictions and limited to simple, routine, and repetitive tasks and a low-stress job that is defined as having only occasional decision making and only occasional changes in the work setting with no interaction with the public and occasional interaction with coworkers and supervisors, the VE opined the individual could not perform the past work as a construction flagger. (Tr. at 548-549.) However, the VE testified that the individual could perform other heavy work such as building maintenance laborer, medium work such as store laborer, furniture cleaner, light work such as garment bagger, night cleaner, and sedentary work such as sorter and table worker. (Tr. at 549.)

In response to a second hypothetical question where the VE was to assume all the same restrictions, but that the individual was 44 years of age, limited to medium work, must avoid concentrated exposure to vibration and with the same mental restrictions as in the first hypothetical, the VE again opined the past relevant work was unavailable, but could perform the other jobs she identified in the medium, light and sedentary levels. (Tr. at 549-550.)

In response to questioning by Claimant's representative, the VE opined that the individual could perform no jobs if he was "so overwhelmingly antisocial that they could not get along with their supervisor." (Tr. at 550-551.) If the individual's antisocial behavior made him ineffective for work 10% of the time or more, then no jobs would be available. (Tr. at 551.) If the individual would require "extra help in interaction with the supervisor" or a "sheltered workshop", then the individual would be precluded from the competitive work setting. (Tr. at 552.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Listing 12.05:

Appendix 1 to Subpart P of Part 404 provides numerous body system listings, of interest here, are the criteria provided under Section 12.05 for intellectual disability. Section 12.05 of the Listing of Impairments provides that Claimant must show "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)." The severity level is met when the requirements under A, B, C or D are satisfied. Id. In order to meet the criteria of § 12.05A, mental incapacity is shown by

dependence upon others for personal needs such as toileting, eating, dressing or bathing and an inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. As an initial matter, the undersigned notes there is no evidence in the record that Claimant meets A criteria and the parties have not raised any arguments on this specific sub-Listing. (Tr. at 501.) In order to meet the criteria of § 12.05B, Claimant must show a valid verbal, performance, or full scale IQ of 59 or less. In order to meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of § 12.05C. Luckey v. Bowen, 890 F.2d 666 (4th Cir. 1989). A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); see also, Petry v. Colvin, 2015 WL 5786769, at *6 (S.D.W. Va. Sept 30, 2015).

As stated above, Claimant contends that the ALJ deviated from the Regulations when he relied on Claimant's IQ scores from 1985 to evaluate his intellectual functioning; he also asserts error in the ALJ's rejection of the medical opinion evidence concerning Claimant's intellectual deficits and instead made conclusions based on his own lay opinion. (Document No. 15 at 11-12.)

The ALJ examined the evidence relating to Claimant's borderline intellectual functioning noting that when Claimant was 13 and 17 years old the evidence of record "clearly shows the claimant's intellectual functioning was <u>above</u> the MMR (mild mental retardation) level." (Tr. at 494, emphasis in original.) The ALJ determined that the decline in Claimant's intellectual functioning "can be attributed to two factors: (i) substance abuse and (ii) head trauma." (Tr. at

494.) The ALJ then referenced the support for this determination from the record of evidence: at age 16, in February 1988, records from the Donofrio Alcoholism Rehabilitation Center indicated that Claimant "was handicapped by substance abuse" (Tr. at 277, 494.); Claimant admitted during a 2011 consultative evaluation that he abused alcohol from ages 18 to 35, and that he also used marijuana as a youth (Tr. at 436-441, 494.); Claimant reported in July 2015 that he had experimented with cocaine and pills in the past, though the ALJ noted the record was unclear if this occurred prior to 2011 (Tr. at 494, 761.); and Claimant's head injury from the ATV accident in June 2009 resulted in a concussion and loss of consciousness. (Tr. at 368-369, 494.) Finally, the ALJ noted that the evaluations provided by Mr. Bailey and Dr. Saar that included the MMR diagnoses were almost two years out from Claimant's head injury. (Tr. at 494.)

The ALJ explained that Claimant's "substance abuse and head injury would be expected to have an adverse effect on his intellectual functioning" and compared these to Claimant's achievement test scores and IQ scores that were administered during his school years in detail, reproduced, *supra*. (Tr. at 494-496.) The ALJ compared Claimant's Full Scale IQ scores from October 1985 and September 1989, when he was almost 14 and 17, respectively: 84 and 78 versus his Full Scale IQ scores when he was 39 in 2011: 56 and 65. (Tr. at 495-496.)

The ALJ acknowledged that Mr. Bailey "indicated the diagnosis of MMR was substantiated by [Claimant's] FSIQ of 56 as well as his level of his adaptive functioning in the areas of self-care, social/interpersonal skills, academic skills and use of community resources". (Tr. at 441, 496.) Moreover, Mr. Bailey "also noted that the MMR diagnosis was 'consistent with [the claimant's] academic and occupational history'". (Id.) The ALJ gave Mr. Bailey's diagnosis of MMR "very little weight" "for numerous reasons": (1) Mr. Bailey did not have the opportunity

to review Claimant's school records, thus he did not review his IQ scores from 1985 and 1989; (2) Mr. Bailey "relied exclusively on the claimant's statements about his school history" despite Mr. Bailey noting Claimant had difficulties recalling many aspects of his academic history; (3) Mr. Bailey was aware of Claimant's substance abuse and head trauma histories but his evaluation did not indicate these were considered as factors in assessing Claimant with MMR; and (4), the ALJ found Mr. Bailey's statements regarding Claimant's deficits in adaptive functioning inconsistent with his own evaluation report that referenced Claimant's activities in daily living and work history, which also included use of heavy equipment. (Tr. at 496-497.)

With regard to Claimant's MMR diagnosis from Dr. Saar, the ALJ noted that Dr. Saar based the diagnosis on the valid IQ score and the State's evaluation [Mr. Bailey's March 2011 evaluation], and that Dr. Saar opined "[t]his impairment appears to have been present prior to the age of eighteen." (Tr. at 470, 494.) The ALJ further noted that Dr. Saar also opined that Claimant met the criteria for 12.05C with the secondary impairment of Major Depression and Generalized Anxiety Disorder (Id.), however, the ALJ gave Dr. Saar's MMR diagnosis including his opinion that Claimant met 12.05C "very little weight". (Tr. at 497.) The ALJ again provided several reasons: despite Dr. Saar's report that he reviewed Claimant's school records, the ALJ noted Dr. Saar did not mention Claimant's school-age IQ scores; Dr. Saar was aware of Claimant's substance abuse, but the report had no indication that this was taken into account for the MMR diagnosis; and similarly, Dr. Saar's report did not reference Claimant's head trauma or loss of consciousness from his ATV accident. (Id.)

The ALJ also gave "little weight" to Dr. Michael Patrick Hackman's diagnosis of mild intellectual disabilities because "it appears to be based upon observation and subjective history, rather than testing and record review." (Id.)

Ultimately, the ALJ concluded that MMR "is not a medically determinable impairment in this case." (Tr. at 498.) For both Titles II and XVI purposes, the ALJ determined that Claimant did not meet "the threshold requirement" of Listing 12.05 "because there is no evidence of significantly subaverage general intellectual functioning with deficits in adaptive function initially manifested during the developmental period." (Tr. at 499.) The ALJ again cited Claimant's IQ scores from 1985 and 1989 as well as his history of substance abuse from 1988 to 2009 and the concussion with loss of consciousness he sustained in 2009. (Id.) The ALJ stated, "it is reasonable to assume that 21 years of substance abuse and a concussion with loss of consciousness would have an adverse effect on the claimant's intellectual functioning." (Id.) Finally, the ALJ found the 1985 test scores provided the "best estimate" of Claimant's baseline intellectual functioning before he began abusing substances, and again found the threshold requirement of 12.05 not satisfied. (Tr. at 499-500.)

The undersigned agrees with Claimant's characterization of the pertinent Regulations whereby the lowest score from either the verbal, performance or full scale IQ scores shall be used in conjunction with Listing 12.05, and that scores obtained after a child attains the age of sixteen years should be viewed as a valid indication of the child's current status, and that Claimant's verbal IQ of 74 in 1989 would be the most stable indicator of intellectual functioning. 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.00(D)(6)(c), 112.00D(10). The undersigned further agrees with Claimant that the Commissioner's Regulations dictate that IQ scores of 40 or above achieved before the age

of 16 are only considered current for two years. Id. § 112.00D(10). At issue in this case is that the ALJ used Claimant's 1985 scores as his baseline for intellectual functioning, expressly reasoning that Claimant was not abusing drugs or alcohol at that time in his life and had not yet suffered from head trauma due to his 2009 ATV accident. Indeed, when he was just days away from turning 14, Claimant's IQ scores were 80 and above in October 1985 (Tr. at 305, 495.), and the "Evaluation Team Report" from Mahoning County Schools two months later in December, contained the statement: "The discrepancy between the child's intellectual disability and achievement is NOT primarily the result of . . . [m]ental retardation." (Tr. at 307-308, 495; emphasis in original.)

Sometime thereafter, the record shows that Claimant started to abuse substances, which the ALJ noted from the February 1988 report, entitled "Medical Evaluation" from the Donofrio Alcoholism Rehabilitation Center, contained a physician's opinion that Claimant was "handicapped by substance abuse" when he was 16 years old.[6] (Tr. at 277, 503.) The ALJ next recognized that September 1989 testing indicated Claimant had a decline in his intellectual functioning. (Tr. at 278, 503.) Claimant's substance abuse continued until June 2009 when he suffered from a concussion and loss of consciousness in the ATV accident. (Tr. at 368-369, 503.) Afterwards, in March and September 2011, Claimant's IQ scores were "significantly lower". (Tr. at 503.) In short, the ALJ's determination that Claimant's 1985 scores were the best baseline for his intellectual functioning prior to his drug abuse and ATV accident is "reasonable to assume" under these facts (Tr. at 499.), however, this deviates from the aforementioned Regulations therefore, those 1985 scores were no longer valid just before Claimant's sixteenth birthday. Accordingly, the undersigned **FINDS** the ALJ reached this factual finding by not applying "the

---

[6] The educational records indicate that Claimant was incarcerated at the Juvenile Justice Center in Youngstown, Ohio from January 1988 through September 1989 due to his behavior. (Tr. at 274-278.)

correct legal standard". <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005) (quoting <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996)).

Both Mr. Bailey and Dr. Saar diagnosed Claimant with MMR based on their observations, including valid IQ test results, but Dr. Saar expressly opined further that Claimant's intellectual impairment predated Claimant's eighteenth birthday, and met 12.05C criteria. (Tr. at 470, 497.) Interestingly, Dr. Saar concurred with Dr. Rosemary Smith's opinion only three months previously, after having "reviewed all the MER in the file and the PRTF of 4/7/11 is affirmed as written." (Tr. at 461.) Notably, Dr. Smith had access to and reviewed Claimant's IQ test results as well as other aptitude tests from school, including Mr. Bailey's test results, when she provided the Psychiatric Review Technique and accompanying mental RFC. (Tr. at 454.) Dr. Smith explicitly found Claimant "not credible" and that "prior testing indicates that the claimant is **not** mentally retarded." (<u>Id</u>., emphasis in original.) She also opined that based on the medical evidence of record that Claimant did not meet "C" criteria of the Listings. (Tr. at 453.) Clearly, Dr. Saar's opinion rendered in September 2011, following his examination of Claimant, conflicts with his June 2011 assessment after his review of the medical evidence of record, and such conflicts remain the ALJ's burden to resolve.

However, the undersigned is also mindful that 20 C.F.R. §§ 404.1527 and 416.927 govern the SSA's criteria for evaluating opinion evidence; per §§ 404.1527(a)(2), 416.927(a)(2):

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Under §§ 404.1527(c)(1) and 416.927(c)(1), more weight is given to an examiner versus a non-examiner. Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

It is significant that two DDS examiners, Mr. Bailey and Dr. Saar, both obtained valid IQ test results, both diagnosed Claimant with MMR, and both indicated the MMR diagnosis was substantiated not only by Claimant's IQ scores, but also indicated that this diagnosis ostensibly manifested during his developmental period. Dr. Saar explicitly stated as much; Mr. Bailey implied as much when he found the diagnosis was "consistent with [the claimant's] *academic . . .* history." (Tr. at 440, 496, emphasis added.) The evidence is clear that Claimant discontinued his academic career long before he turned twenty-two. Even though the ALJ discredited the MMR diagnosis, as well as treating physician Dr. Hackman's "mild intellectual disabilities" diagnosis, the ALJ accepted these providers' diagnoses including generalized anxiety disorder and major depressive disorder, finding both these mental impairments severe. (Tr. at 493, 498.) It is "reasonable to assume" that these providers arrived at these diagnoses based upon their observation of Claimant as well as his subjective history. (Tr. at 497.) Additionally, the undersigned finds the "great

weight" afforded to Dr. Smith's opinion is interesting insofar as she found Claimant could "respond appropriately to supervision, co-workers and usual work situations, and deal with changes in a routine work setting" though the ALJ himself found Claimant had moderate difficulties in social functioning that required accommodation in his RFC assessment. (Tr. at 501, 504, 507.)

The undersigned is mindful that the ALJ found neither Mr. Bailey nor Dr. Saar indicated that they accounted for Claimant's history of substance abuse and head trauma when diagnosing MMR. Among other reasons given, the ALJ found Mr. Bailey's diagnosis of MMR was flawed because did not have access to Claimant's academic records, including his adolescent IQ scores that were above MMR level. (Tr. at 496-497.) If remand was necessary in the prior proceeding[7] in order to properly evaluate whether Claimant's mental impairments met any Listings, thus necessitating Mr. Bailey's consultation, then it would have been appropriate to ensure that the consultative examiner had all the necessary information and data available in order for the ALJ to obtain a complete opinion. To put it succinctly, since the ALJ found examiner opinion evidence had these evidentiary gaps, then further evaluation or inquiry was warranted, specifically as to whether Claimant's intellectual deficits were congenital, or the result of substance abuse history and/or head trauma. See, 20 C.F.R. §§ 404.1519p(b), 416.919p(b). For the ALJ to reject expert opinion evidence due to such flaws and supplant with his own lay opinion outside of his field of expertise renders this conclusion unsupported by substantial evidence. Wilson v. Heckler, 743 F.2d 218, 221 (4th Cir. 1984.)

---

[7] See Ashworth v. Colvin, civil action number 3:14-cv-10850.

In short, the undersigned **FINDS** that when the ALJ: (1) discounted the opinions of two independent DDS examiners who both diagnosed Claimant with MMR that they opined manifested sometime during Claimant's developmental period; (2) discounted the opinion of a treating physician's diagnosis of mild intellectual disabilities; and (3) found evidentiary gaps in the opinion evidence with respect to Claimant's history of substance abuse and head trauma, and instead rendered his own lay opinion to fill these gaps, was not "rational" and therefore not supported by substantial evidence. Oppenheim, 495 F.2d at 397.

Evaluating Credibility and Pain:

Social Security Ruling 96-7p[8] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See, also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and

---

[8] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on January 22, 2016. See, SSR 16-3p, 2016 WL 1131509.

from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

As an initial matter, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

After properly performing the two-step process[9], the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms, and determined he was not entirely credible. (Tr. at 506.) Regarding Claimant's testimony that he is unable to read, the ALJ cited educational records that indicated otherwise, albeit at the fourth grade level (Tr. at 506.); Claimant's father testified that Claimant could read at the second grade level, and that Mr. Bailey's evaluation indicated Claimant had no problems in comprehending or complying with directions. (Id.) With respect to his allegations that he suffered from severe depression and anxiety, the ALJ noted the medical evidence showed Claimant "received minimal conservative treatment" which included medication without evidence of follow-up in 2011, moreover, the record shows there was no mental health treatment from September 2011 to June 2014. (Id.) Despite Claimant's testimony that he left school due to poor academic performance, the ALJ noted the record showed he was withdrawn

---

[9] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

due to non-attendance. (Id.) Although Claimant testified he had ongoing problems as a result of his ATV accident, the ALJ acknowledged there were no records showing ongoing treatment for same. (Id.) Claimant's assertion that he does not go anywhere due to his social deficits or do anything due to lack of interest or hobbies were belied by his post alleged onset date ATV accident and having attended a party in June 2014 at which he got into a fight. (Id.) The ALJ found his allegations of severe back and joint pain were not corroborated by the medical records, again, the record contains no evidence of treatment for his physical impairments between September 2011 to June 2014. (Id.) The ALJ also found the evidence showed Claimant was able to live independently and perform many daily activities such as washing laundry, and performing household chores. (Id.) In sum, the ALJ concluded that "[g]iven all of the above . . . the claimant's allegations of disabling impairments are less than credible." (Id.)

Even though Claimant asserts that the ALJ's express threshold finding pursuant to Craig v. Chater was "unclear" as to whether it pertained to his application for Title II or Title XVI benefits (Document No. 17 at 2-3.), the ALJ's finding encompassed Claimant's allegations of both physical and mental impairments, and included testimonial, medical, educational, and opinion evidence that concerned these impairments from before and after the alleged onset date, through the DLI and beyond, accordingly, the undersigned **FINDS** the ALJ's credibility assessment pertained to both Claimant's Title II and Title XVI claims. Further, the undersigned **FINDS** that the ALJ's credibility assessment complied with the pertinent Regulations and Ruling, and supported by substantial evidence.

The RFC Assessment:

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. <u>See</u> Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. <u>See</u> <u>Id</u>. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

On this issue, Claimant asserts that the ALJ's mental RFC restriction[10] to simple, routine and repetitive tasks failed to accommodate his finding that Claimant had moderate difficulties in concentration, persistence or pace in light of the holding in <u>Mascio v. Colvin</u>, 780 F.3d 632, 638 (4th Cir. 2015). (Document No. 15 at 15.) "Concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." <u>See</u>, 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(C)(3). There is no dispute that the ALJ found Claimant had moderate difficulties in concentration, persistence or pace, and based this finding on Claimant's own reports of diminished concentration, pace, and memory during the consultative evaluation with Mr. Bailey. (Tr. at 500.)

---

[10] It is noted that the ALJ assessed Claimant's mental portion of the RFC identically in both his Title II and Title XVI applications, limiting him "to simple, routine, and repetitive tasks. He can only work in a low-stress job . . . He cannot interact with the public and can have only occasional interaction with coworkers and supervisors." (Tr. at 501, 504.)

The ALJ noted that Mr. Bailey determined Claimant's "concentration was severely deficient; his persistence was moderately deficient; and his pace was mildly deficient." (Id.) The ALJ also considered Claimant's self-report that he could "watch television shows with no reported problems" in his finding for moderate limitations in this particular functional area. (Id.)

Further on in his written decision, the ALJ repeated Mr. Bailey's findings that Claimant had "moderately deficient memory, severely deficient concentration, moderately deficient persistence, and mildly impaired pace"; the ALJ also acknowledged Dr. Saar's findings that Claimant exhibited "moderately to markedly impaired concentration and attention[.]" (Tr. at 504.) With respect to the opinion evidence relating to Claimant's mental impairments, the ALJ noted Dr. Smith's opinion that Claimant "retain[s] the ability to understand, remember, and carry out simple instructions, make simple work-related decisions, respond appropriately to supervision, co-workers and usual work situations, and deal with changes in a routine work setting." (Tr. at 507.) The ALJ gave Dr. Smith's opinion "great weight because it is well-supported and it is consistent with the objective evidence of record. In addition, [Dr.] Smith is a mental health specialist who is familiar with the Social Security disability programs and their evidentiary requirements." (Id.)

The ALJ also considered the testimony of Ralph Ashworth, who specifically testified that he "hired the claimant to work for him, but had to constantly move him from one location to another because the claimant could not get along with people." (Tr. at 507, 540-541.) Mr. Ashworth testified that Claimant was in fights at school and while on the job. (Tr. at 508.) The ALJ afforded "some weight" to Mr. Ashworth's statements, because he is Claimant's father, "sees the claimant on a regular basis", and with regard to his comments about Claimant's behavioral problems, this was corroborated by school and treatment records. (Id.) The ALJ also considered

Claimant's testimony regarding his employment for his father as a construction flagger: "He stopped working because he had road rage. The claimant said his father laid him off." (Tr. at 502, 524, 525.)

From the ALJ's review of the aforementioned evidence, the hypothetical questions posed to the VE "fairly" accommodated Claimant's mental impairments, specifically with respect to the limitation to "simple, routine, and repetitive tasks". <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989); (Tr. at 501, 504, 548, 549.) The record shows that Dr. Smith, who rendered her opinion in April 2011, had the opportunity to review Mr. Bailey's consultative evaluation in preparation for her own mental RFC. (Tr. at 454.) Dr. Smith also opined that Claimant had moderate difficulties in maintaining concentration, persistence or pace. (Tr. at 452.) In short, given the ALJ's heightened assessment of Dr. Smith's mental RFC described *supra*, his own RFC determination restricting Claimant to only those jobs involving "simple, routine and repetitive tasks" has support in the medical opinion evidence. The ALJ further accommodated Claimant's concentration, persistence or pace deficits by limiting the pool of available jobs to those that were low-stress, involving only occasional decision making and changes in the work setting.

Moreover, the undersigned notes that the evidence overwhelmingly showed that Claimant quit working in August 2008 not because of any issues with his concentration, persistence or pace, but rather his social functioning limitations. Claimant testified, as did his father/former employer, that he is unable to get along with other people; that was the primary source of his employment problems.[11] Indeed, the ALJ found Claimant had moderate difficulties in social functioning, based on Claimant's reported "problems with anger and taking it out on other people" which manifested

---

[11] Claimant testified that when working for other employers, he would get frustrated and get fired for getting loud or for getting into fights with other employees. (Tr. at 94, 96; Document No. 15 at 5.)

into his getting into a fight when he went to a party in June 2014. (Tr. at 500.) This deficit in social functioning was accommodated by the ALJ's RFC assessment by limiting the jobs to those without interaction with the public and only occasional interaction with coworkers and supervisors. Indeed, the VE testified that the jobs she identified in response to the ALJ's hypotheticals "do not require an individual worker to interact with coworkers in the performance of the job." (Tr. at 550.) Further, the VE opined that occasional interaction with a supervisor would not preclude Claimant from working due to his moderate social functioning difficulties. (Id.)

In short, the ALJ fairly and appropriately accommodated for Claimant's mental impairments in the hypothetical questions posed to the VE, resulting in numerous jobs he could otherwise perform. Accordingly, the undersigned **FINDS** the RFC assessment is based on substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 15.) to the extent that the ALJ did not follow the Commissioner's own Regulations with respect to the application of Claimant's IQ scores in determining whether the initial threshold of Section 12.05 had been met, and further did not follow Regulations with respect to obtaining a complete psychological evaluation, **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 16.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings for the reasons stated above.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: May 12, 2017.

Omar J. Aboulhosn
United States Magistrate Judge